# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 18-cr-197 (SRN/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Detloff Marketing and Asset Management, Inc. (1), Jeffery J. Detloff (2), and Lori K. Detloff (3), | |
| Defendants. | |

Andrew K.M. Rosa, Jonathan Clow, Kevin C. Culum, Michael Neal Loterstein, Molly Kelly, United States Department of Justice, 209 South LaSalle Street, Suite 600, Chicago, Illinois 60604, for United States of America

Ryan Patrick Garry, Ryan Garry, Attorney, LLC, 333 South Seventh Street, Suite 2350, Minneapolis, Minnesota 55402, for Detloff Marketing and Asset Management, Inc.

Andrew S. Birrell and Ian S. Birrell, Gaskins, Bennett & Birrell, LLP, 333 South Seventh Street, Suite 3000, Minneapolis, Minnesota 55402, for Jeffrey K. Detloff

Joseph S. Friedberg, Joseph S. Friedberg, Chartered, 701 4th Avenue South, Suite 300, Minneapolis, Minnesota 55415, for Lori K. Detloff

HILDY BOWBEER, United States Magistrate Judge

The above-captioned case comes before the undersigned on Defendant Jeffrey J.

Detloff's Motion to Suppress Search and Seizure Evidence [Doc. No. 42], Motion to

Suppress Statements [Doc. No. 43], and Defendant Detloff Marketing and Asset

Management's ("DMAM") Motion to Suppress Evidence Obtained as a Result of Search

and Seizure [Doc. No. 54].[1]  The case was referred for resolution of pretrial matters

pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.  Special Agents

Jonathan Holden and Matthew Vogel testified at the hearing before the undersigned and

numerous exhibits were submitted for the Court's consideration.  (Ex. & Witness List [Doc.

No. 66].)  Supplemental briefing was requested, and the Court took the matter under

advisement on March 19, 2019. *See* (Feb. 12, 2019, Minute Entry [Doc. No. 65].)  For the

reasons stated below, the Court recommends that the motions be denied.

## I.     BACKGROUND

Starting in 2013, Jeffrey and Lori Detloff and DMAM were the subject of an

investigation into whether they had conspired with others to rig bids "or otherwise subverted

anti-fraud measures in order to win repair bids" on properties owned by various financial

institutions.  (Gov't Ex. 6 ¶ 13.)  As the investigation ramped up, the Detloffs' residence

was placed under surveillance. (*Id.* ¶ 4.)  On May 18, 2015, as part of the investigation,

Agent Holden conducted a "trash pull," i.e., he searched the Detloffs' trash.  (*Id.* ¶ 25.)

Agent Holden testified at the hearing that he has been trained about when property is

considered abandoned, what is considered the "curtilage" of a property, and what is

considered public property.  (Tr. at 34–35.)  Agent Holden testified that when he searched

the trash, the container was at the curb in front of the residence, and appeared "consistent

with the trash being left there for collection by a trash collection service."  (*Id.* at 35.)  He

believed there were other trash containers on the street in front of other residences on the

---

[1]  There are no pending motions that were brought by Defendant Lori K. Detloff.
Accordingly, references herein to "Detloff" refer to Jeffrey Detloff unless otherwise
indicated.

same block that day.  (*Id.* at 54.)  Agent Holden could not recall precisely where the trash

container he searched was located relative to the driveway of the Detloff residence, but

stated it was at the curb and easily accessible.  (*Id*. at 52–53, 56.).  He stated that it is FBI

policy to search only trash that has been placed at the curb.  (*Id*. at 56.)

Based in part on items discovered in the trash and information provided by at least

one cooperating witness, Agent Holden concluded the Detloffs were conducting business

related to the allegedly fraudulent scheme out of both their residence in Minnetonka,

Minnesota, and DMAM's offices in Hopkins, Minnesota.  (Gov't Ex. 6 ¶ 26; Gov't Ex. 7

¶ 19.[2])

Agent Holden prepared search warrant applications to search the Detloff residence

and DMAM's offices.  These applications were reviewed by the Honorable Tony N. Leung,

United States Magistrate Judge, who issued the search warrants on June 4, 2015.  (Gov't

Exs. 6–7.)

On June 10, 2015, Agent Holden, accompanied by Assistant United States Attorney

Andrew Rosa, interviewed Jeffrey Detloff at DMAM's offices while other agents, including

Agent Vogel, executed the search warrant for DMAM's offices.  (Tr. at 19–34, 60–76.)  On

that morning, Agent Holden was in a car in DMAM's parking lot awaiting Detloff's arrival.

(Tr. at 21.)  Other agents were in cars off site at a staging area.  *See, e.g.*, (Tr. at 21–22, 61–

62.)  Agent Holden was dressed in a suit and his sidearm was not visible when he

---

[2]  Government Exhibit 6 is the search warrant for the Detloff residence and Government
Exhibit 7 is the search warrant for DMAM's offices.  That said, the affidavit in support of
each is the same.  For clarity, the Court references Government Exhibit 6 when describing
the search warrant for the residence and Government Exhibit 7 when describing the search
warrant for DMAM's offices.

approached Detloff. (Tr. at 22, 27.) Agent Holden identified himself as a Special Agent
with the FBI, requested to speak with Detloff, and stated he wanted to ask questions
regarding his involvement with a Mr. Monahan. (Tr. at 22.) Detloff and Agent Holden
conversed for approximately five minutes in the parking lot. (Tr. at 23.)

At that point, Detloff suggested that they go to his office and he escorted Agent
Holden into his private office at DMAM. (Tr. at 24.) Soon thereafter, AUSA Rosa also
arrived. (*Id.*) Agent Holden and AUSA Rosa were the only individuals involved in the
interview with Detloff. (*Id.* at 24.) Agent Holden does not recall anyone else, whether from
DMAM or from law enforcement, requesting to enter Detloff's office during that time.
(*Id.* at 47.)

The interview took approximately two hours. (*Id.* at 28.) It is undisputed that
Detloff was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.*)
Agent Holden testified that Detloff conducted himself in a "calm, businesslike" manner.
(*Id.*) Agent Holden believed that Detloff appeared to understand the questions being asked
of him and that his responses were clear and coherent. (*Id.*) Agent Holden stated that
Detloff never asked to stop the interview, *see* (*id.*), although he could not recall whether
Detloff asked to take a break to use the restroom or get a drink of water at any point.
(*Id.* at 31.) At least twice during the interview, Agent Holden warned Detloff that lying was
a federal crime. (*Id.* at 29–30.) Detloff was not arrested at the conclusion of the interview
or the search of the DMAM offices. (*Id.* at 31.)

At approximately 11:00 a.m., Agent Holden called Agent Vogel and instructed him
to begin the search of the DMAM offices pursuant to the issued warrant. (*Id.* at 77–78.)

4

Agent Vogel testified that his team entered DMAM's offices at approximately 11:15. (*Id.*)

Agent Vogel noted that Detloff stayed mostly in his own office during the pendency of the

search, which took approximately five hours. *See, e.g.*, (*id.* at 49, 67–68.) Agent Vogel also

testified that when Detloff was not in his office, he was escorted by an FBI agent. (*Id.* at 68,

85.) The purpose of the escort was "for agent safety and to see what he was doing to ensure

that there was no evidence being potentially disturbed." (*Id.* at 68.) Agent Vogel also stated

that aside from the escort, Detloff was generally free to move about DMAM's offices.

(*Id.* at 85.)

  After the interview was concluded but while the search of DMAM's offices was in

progress, Agents Holden and Vogel approached Detloff and asked him if he would sign a

form giving consent to search a storage area in the basement of DMAM's office building.

(*Id.* at 32–33; Gov't Ex. 5.) Agents Holden and Vogel found out about the existence of the

storage room because of answers Detloff had given during the interview. (Tr. at 32.)

Detloff was provided instructions regarding the form before he signed it. (*Id.* at 71, 72.)

The consent form identified the area to be searched as "[t]he storage room for suite 200

located in the basement" of DMAM's office building, and specifically states that "I have

been advised of my right to refuse consent"; "I give this permission voluntarily"; and

"I authorize these agents to take any items which they determine may be related to their

investigation." (Gov't Ex. 5.) On the basis of Detloff's consent, agents searched the storage

room and seized additional evidence found there. (Tr. at 74.) Because the storage area was

apparently a shared space, Detloff pointed out which property belonged to him and which

property did not. (*Id.* at 75.)

At no point, either during the interview or during the execution of the search warrant was Detloff handcuffed or physically restrained. *See, e.g.*, (*id.* at 31, 68–69.)  Both Agents Holden and Vogel testified that Detloff was always free to leave, but neither recalled ever specifically telling Detloff he was free to do so. *See, e.g.*, (*id.* at 30–31, 64, 67–68, 72, 79.)

Based in part on information obtained during Detloff's interview and information gathered as a result of the search of DMAM's offices, Agent Vogel prepared an application for a search warrant to obtain emails from Detloff's Google account. (Gov't Ex. 8.)  The application was reviewed by the Honorable Jeffrey Keyes, United States Magistrate Judge, and a search warrant issued on January 26, 2016.  (*Id.*); *see also* Order, *United States v. Search Warrant*, 16-mj-27 (JJK) [Doc. No. 2 at 2].

Defendants Jeffrey Detloff and DMAM seek to suppress all statements made during the interview and all evidence obtained pursuant to the trash pull and the executed search warrants.

## II.    DISCUSSION

As an initial matter, the Court notes that both moving Defendants seek suppression of essentially the same things. *Compare* (Def. Jeffrey J. Detloff's Post-Hearing Mem. in Supp. of Mots. to Suppress Evidence Obtained by Search & Seizure & Statements, "Detloff's Suppl. Br." [Doc. No. 73]), *with* (DMAM's Mem. of Law in Supp. of Mot. to Suppress Evidence Obtained as a Result of Search & Seizure, "DMAM's Suppl. Br." [Doc. No. 74].) The primary difference is that Detloff seeks suppression of his statements during the interview conducted at DMAM's offices, while DMAM does not.  Thus, any questions of standing are largely irrelevant, as the challenges to the lawfulness of the searches and

6

seizures are largely coextensive. That is, the Court is satisfied that either Detloff, DMAM, or both have standing to challenge the constitutionality of the searches and seizures at issue. Therefore, instead of wading into the thorny question of standing on a per party and per issue basis, the Court will assume without deciding that standing is met and will address the merits of the various constitutional challenges.

### A.    Trash Pull

Defendants primarily argue that the trash pull at the Detloff residence was unconstitutional because the Government could not precisely establish the location of the trash container. *See, e.g.*, (Detloff's Suppl. Br. at 12–13; DMAM's Mot. to Suppress at 4–8; DMAM's Suppl. Br. at 5–8.) In addition, because search warrants were obtained for the residence and the business office based in part on information obtained from the trash pull, Defendants argue that any evidence seized pursuant to those warrants "should be suppressed as derivative of the unconstitutional trash search." (DMAM's Mot. to Suppress at 8; *see also* Detloff Suppl. Br. at 13.)

### 1.        Legal Standard

In the leading case involving the Fourth Amendment and trash pulls, the Supreme Court established that when a person "exposes [his or her] garbage to the public" it deprives that person of Fourth Amendment protections. *California v. Greenwood*, 486 U.S. 35, 40 (1988). Specifically, the Court in *Greenwood* found that the respondents, "having deposited their garbage in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,

respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded." *Id.* at 40-41.

### 2.    Analysis

Defendants argue that because Agent Holder could not testify to the specific location of the trash container when he pulled the trash, it is unclear whether the trash was within the curtilage of the Detloff residence or without. (DMAM's Suppl. Br. at 8–9.) DMAM also argues that under an emerging line of cases in *Florida v. Jardines*, 569 U.S. 1 (2013), and *United States v. Jones*, 565 U.S. 400 (2012), suppression is warranted because the government's actions constituted a trespass on Detloff's property interest. *See* (*id.* at 6–8.) But the argument that *Jones* and *Jardines* have in any way changed the analysis set forth in *Greenwood* is misplaced. In 2018, the Eighth Circuit reaffirmed its holding in *United States v. Comeaux*, 955 F.2d 586 (8th Cir. 1992), that "'the proper focus under *Greenwood* [remains] whether the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable.'" *United States v. Thompson*, 881 F.3d 629, 632 (8th Cir. 2018) (quoting *Comeaux*, 955 F.2d at 589) (alteration in original). Consequently, the parties' arguments premised on the location of the trash with respect to the curtilage are largely unavailing. What is critical here is whether the trash was "readily accessible to the public" and not whether the trash was left within or outside of the curtilage. *Thompson*, 881 F.3d at 632.

In *Thompson*, the Eighth Circuit found the following facts to be indicative that the trash was "readily accessible": "[t]he trash was placed in a location from which the garbage collectors regularly collected it at the regularly-scheduled time of collection"; "[t]he garbage

8

container was easily visible from the street"; "and there were no barriers preventing access to the container or its contents." 881 F.3d at 632. Here, the unrefuted evidence shows that Detloff had no reasonable expectation of privacy in his trash. First, Agent Holden affirmed that it is "FBI policy to only conduct a trash pull when the trash is at the curb," that "Detloff's trash was at the curb," and that the trash was "easily accessible." (Tr. at 55–56.) This testimony is also consistent with Agent Holden's affidavit in the search warrant application for the Detloff residence, in which he stated that "[o]n 18 May 2015, law enforcement officers conducted a search of the trash abandoned in front of [Detloff's] residence." (Gov't Ex. 6 ¶ 25.)

In addition, although there is no evidence regarding "the regularly scheduled time of collection," Agent Holden testified that he recalled seeing other trash containers at the curb in front of other residences on the same block, *see* (Tr. at 54), which is at least circumstantial evidence that the Detloff trash container had been placed at the curb in anticipation of the "regularly scheduled time of collection," and that it was placed "in a location from which the garbage collectors regularly collected it." *Cf. Thompson*, 881 F.3d at 632. Furthermore, there was unrefuted testimony that the trash container was easily visible from the street and that there were no barriers to the container or its contents. (Tr. at 55–56; Gov't Ex. 6 ¶ 25.) As a result, like in *Thompson*, the Court concludes that the facts demonstrate that Detloff had no reasonable expectation of privacy in his trash, and the trash pull did not violate his Fourth Amendment rights. *Cf. Thompson*, 881 F.3d at 632.

Because the Court concludes the trash pull did not violate Detloff's constitutional rights, Defendants' challenges to the search warrants obtained in reliance on that

information (and the evidence seized pursuant to those warrants) necessarily fail. *See Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (stating that suppressing evidence as "fruit of the poisonous tree assumes the existence of a constitutional violation").

## B.    Suppression of Statements

### 1.    Legal Standard

The Fifth Amendment provides that "[n]o person . . .  shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  Prior to initiating a custodial interrogation, law enforcement officials must inform the person being questioned of his rights under the Fifth Amendment as a "procedural safeguard" in order to "secure the privilege against self-incrimination."  *Miranda*, 384 U.S. at 444.  That procedural safeguard is met when "[p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney."  *Id.*  A *Miranda* warning is only required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.*; *see also Stansbury v. California*, 511 U.S. 318, 322 (1994).  Failing to inform the interrogee of his Fifth Amendment rights may result in exclusion whereby the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant." *Miranda*, 384 U.S. at 444.

An interrogation occurs where an officer engages in "either express questioning or its functional equivalent," which includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from

the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). "The latter portion of

this definition focuses primarily upon the perceptions of the suspect, rather than the intent of

the police." *Id.* at 301. Information voluntarily provided by a suspect is not considered to

be in response to an interrogation, and is admissible with or without *Miranda* warnings.

*United States v. McGlothen*, 556 F.3d 698, 701 (8th Cir. 2009).

"Custody" is the deprivation of "freedom of action in any significant way."

*Yarborough v. Alvarado*, 541 U.S. 652, 663-65 (2004). In deciding whether a person was

"in custody," courts examine "the presence and extent of physical and psychological

restraints placed on the person's liberty during the interrogation 'in light of whether a

reasonable person in the suspect's position would have understood his situation to be one of

custody." *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) (quoting *United States*

*v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990)); *see also United States v. Czichray*,

378 F.3d 822, 828 (8th Cir. 2004).

> The Eighth Circuit Court of Appeals has identified six common indicia of custody:
>
> (1) whether the suspect was informed at the time of questioning that the
> questioning was voluntary, that the suspect was free to leave or request the
> officers to do so, or that the suspect was not considered under arrest;
> (2) whether the suspect possessed unrestrained freedom of movement during
> questioning; (3) whether the suspect initiated contact with authorities or
> voluntarily acquiesced to official requests to respond to questions; (4) whether
> strong arm tactics or deceptive stratagems were employed during questioning;
> (5) whether the atmosphere of the questioning was police dominated; or,
> (6) whether the suspect was placed under arrest at the termination of the
> questioning.

*Griffin*, 922 F.2d at 1349. The first three indicia are mitigating factors that weigh against

finding that custody existed. *Axsom*, 289 F.3d at 500–01. Conversely, the last three indicia

are aggravating factors that weigh in favor of custody. *Id.* at 501. These six indicia are not

exclusive, and "a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor." *Id.*

### 2. Analysis

While the record provides more detail regarding the absence of aggravating than the presence of mitigating factors, after considering each of the *Griffin* factors and the totality of the circumstances, the Court concludes that Detloff was not in custody when he was interviewed.

### a. Whether Detloff was Informed That He was Free to Leave

The first *Griffin* factor is whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect could terminate the interview at any time, or that the suspect was not under arrest. 922 F.2d at 1349. "The most obvious and effective means of demonstrating that a suspect" is not in custody "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Id.*

Here, both Agents Holden and Vogel testified that Detloff was always free to leave, but neither recalls whether Detloff was ever affirmatively informed that he was free to leave, or whether any other statement was made to Detloff to the effect that he could terminate the interview at any time. *See, e.g.*, (Tr. at 30–31, 64, 67–68, 72, 79.) Thus, the record on this issue does not weigh in favor of finding that the interview was non-custodial.

But, even if an interviewee is not explicitly told he is free to leave or to terminate the interview, that does not necessarily weigh in favor of a finding that he *was* in custody. Specifically, "the opposite inference—that a suspect not being told he is free to leave during

12

police questioning is a strong indication he was in custody—does not necessarily follow because the touchstone of our inquiry remains whether [the suspect] was restrained as though he were under formal arrest." *United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016) (internal quotation marks omitted). Here, Detloff was not handcuffed or physically restrained in any way during the interview, he was interviewed in his own office (the location he had suggested) at DMAM, and there was no evidence that he ever requested, let alone was denied, the opportunity to take a break or to terminate the interview. *See, e.g.*, (*id.* at 29, 31, 68–69; *see also* Gov't Ex. 3 (photo of Detloff's office showing the table where the interview occurred)). Consequently, the record is devoid of facts that suggest Detloff "was restrained as though he were under formal arrest." Thus, although it appears no one affirmatively told Detloff that he was free to leave or otherwise terminate the interview at any time, the Court finds from the totality of the circumstances that the first *Griffin* factor is neutral in the overall custody determination.

> **b.    Whether Detloff Possessed Unrestrained Freedom of Movement**

The second *Griffin* factor is whether the suspect's freedom of movement was restricted during questioning. 922 F.2d at 1349. "Circumstances of custody are frequently obviated where the suspect's freedom of action is not curtailed during questioning." *Id.* at 1350. Although suspects are often escorted or chaperoned during questioning for reasons other than custody, "the relevant inquiry is the *effect on the suspect*." *Id.* (emphasis in original) (internal quotation marks omitted). Restraints associated with a formal arrest include being "placed under guard during questioning, or told to remain in the sight of interrogating officials." *Id.* at 1351. On the other hand, restraining an individual in

handcuffs and asking him to remain in a certain area "during the initial security sweep is not indicative of . . . custody, but rather is simply the cautious—and reasonable—conduct that would be expected in the execution of a lawful search warrant in a private residence." *United States v. Durand*, No. 11–cr–228 (MJD/JJK), 2011 WL 5444112, at *7 (D. Minn. Oct. 24, 2011) (Keyes, Mag. J.).

Here, there is no evidence that Detloff's movement was ever restricted during the interview. At no time in the course of the day was he handcuffed or otherwise physically restrained. *See, e.g.*, (*id.* at 31, 68–69.) He was interviewed for approximately two hours. (Tr. at 28.) Agent Holden testified that he does not recall whether Detloff ever asked to leave to get some water or go to the bathroom, but he would have been free to do so. *See* (*id.* at 31.) Agent Holden testified that it is his usual practice not to allow someone to use his telephone during an interview, but he did not specifically recall whether he said that to Detloff. Detloff was, however, observed using the phone later in the day, after the interview was over. *See* (*id.* at 46, 68.)

Agent Vogel testified that after the interview, while agents were searching the DMAM premises, Detloff continued to remain in his office most of the time, although he was escorted by an agent whenever he left his office. *See, e.g.*, (Tr. at 67–68.) The purpose of the escort was "for agent safety and to see what he was doing to ensure that there was no evidence being potentially disturbed." (*Id.* at 68.) And, as already noted, both Agents Holden and Vogel testified that at all times Detloff was free to leave if he wished to do so. *See, e.g.*, (*id.* at 30–31, 64, 67–68.) On the whole, therefore, this factor leans in favor of a finding that Detloff was not in custody.

14

### c.    Whether Detloff Voluntarily Acquiesced to Questioning

The third *Griffin* factor is whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions.  922 F.2d at 1349.  The Eighth Circuit emphasized the disjunctive nature of this prong in *Axsom*. 289 F.3d at 501. The third mitigating factor is therefore present when the suspect voluntarily acquiesces to requests to answer questions.  *Id.* at 501–02. A suspect's friendly and cooperative demeanor and offers to help agents find evidence bolsters this finding. *Id.* at 502.

Of the mitigating factors, this weighs most strongly in favor of a finding that Detloff was not in custody.  It is undisputed that when Agent Holden approached Detloff in the DMAM building parking lot, Detloff agreed to an interview, and it is also undisputed that it was Detloff who suggested his own office on the premises be used for that purpose.  (Tr. at 21, 24.)  In addition, Agent Holden observed that Detloff was acting in a "calm, businesslike" manner, and never indicated that he was unwilling to speak with Agent Holden or that he wanted to stop the interview.  *See, e.g.*, (*id.* at 23, 28.)  Agent Holden described Detloff as cooperative, providing answers to the questions asked. (*Id.* at 30.) Under the circumstances, the Court concludes this factor leans in favor of finding that Detloff was not in custody.

### d.    Whether the Interviewers Used Strong Arm or Deceptive Tactics

The fourth *Griffin* factor is whether strong arm tactics or deceptive stratagems were employed during questioning. 922 F.2d at 1349.  Such tactics and stratagems may include confronting suspects with false or misleading information, lying repeatedly, employing a good cop/bad cop routine, separating the suspect from nearby friends or family, using

persistent and relentless questioning, giving false legal advice in an attempt to trick the suspect into a confession, or manipulating the suspect's insecurities about his surroundings. *United States v. Peterson*, No. 14–cr–328 (JRT/FLN), 2015 WL 1585507, at *7 (D. Minn. Apr. 2, 2015) (Tunheim, J.) (citing *United States v. Beraun–Panez*, 812 F.2d 578, 580 (9th Cir. 1987); *Miranda*, 384 U.S. at 455).

In *Axsom*, the Eighth Circuit concluded that law enforcement did not use strong arm tactics or deceptive stratagems during their questioning, because although they were armed, they did not take a threatening posture toward the defendant, display their weapons, or show physical force during the questioning. 289 F.3d at 502. The court also found significant the defendant's testimony that the agents asked him "'straightforward questions' and that he gave 'straightforward answers.'" *Id.*

There is no evidence that Agent Holden or any other agent employed strong arm tactics or deceptive stratagems here. Here, as in *Axsom*, those interviewing Detloff never displayed their weapons, took a threatening posture, or employed the threat of physical force during questioning. Indeed, Agent Holden was not dressed in uniform and his sidearm was not visible. (Tr. at 22, 27.) In addition, the interview was conducted while both Detloff and the interviewers were seated, and the interview was conducted in a "calm, businesslike" manner. (*Id.* at 27, 28.) On at least two occasions Agent Holden admonished Detloff regarding perceived inaccuracies in his answers, and warned him that lying was a federal crime. (*Id.* at 29–30.) But Defendants cite no cases holding that such admonitions somehow convert an interview into a custodial interrogation. In sum, the Court finds the fourth factor absent, which weighs against a finding of custody.

16

### e.    Whether There Was a Police-Dominated Atmosphere

The fifth *Griffin* factor looks to whether the context of the questioning, viewed in its entirety, was police-dominated. 922 F.2d at 1349. Courts consider, for example, the location and length of the questioning, whether the police took full control of the site, and whether the police dictated the course of conduct for the suspect or others present at the scene. *Id.* at 1352. For example, an interrogation that occurs in the "comfort and familiarity" of a suspect's residence is less likely to be custodial than a location like the police station. *See Axsom*, 289 F.3d at 502. Specific to the facts of this case, the Eighth Circuit has extended notions of "comfort and familiarity" to business settings. *See, e.g.*, *Laurita*, 821 F.3d at 1028; *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984).

Courts are more likely to find custody where the police lead a suspect to believe that they have taken full control of the scene. *Griffin*, 922 F.2d at 1349. Courts may also consider the number of agents who participated in the interview compared with the number of agents present at the scene. *Axsom*, 289 F.3d at 502. In *Axsom*, for example, the Eighth Circuit disagreed with the district court's finding of a police-dominated atmosphere based on the presence of nine agents and specialists at the scene, because only two agents conducted the interview, the questioning was a two-way street between the agents and the defendant, and the defendant was interviewed while he smoked a pipe in his easy chair. *Id.*

Similarly here, Detloff was interviewed only by Agent Holden and AUSA Rosa, and Agent Holden was the primary interviewer. These facts weigh against a finding that the atmosphere was police-dominated. *See, e.g.*, (Tr. at 29, 50, 57); *cf. Axsom*, 289 F.3d at 502. Furthermore, as the Eighth Circuit in *Laurita* concluded, interviews conducted within a

17

business generally lack indicia of a police-dominated atmosphere because the workplace location is "familiar to [defendant] and a place where [he] would be comfortable and less threatened." 821 F.3d at 1028 (second alteration in original) (internal quotation marks omitted).

Any argument that the presence of the officers executing the search created a police-dominated atmosphere is also unavailing. First, the interview began some time (and may have been nearly finished) before the additional agents came on the scene to execute the search warrant for the premises. (Tr. at 32, 49, 63.) The presence of the agents conducting the search could not have contributed to a police-dominated atmosphere to the extent the interview took place before they had even arrived. And even if the search warrant had been executed contemporaneously with the interview, "[a]ny warrant search is inherently police dominated; there is nothing untoward about that circumstance." *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011). It is well-settled in the Eighth Circuit that "a 'police-dominated' atmosphere arising from the execution of a search warrant by a group of armed agents likewise is not sufficient to establish an overborne will." *Williams*, 760 F.3d 811, 816 (8th Cir. 2014). *Williams* is further instructive because the *Williams* court found the environment was not "police-dominated" despite the fact that the officers executing the warrant used force to enter Williams's "own turf." *See id.* at 815. Here, Detloff "allowed [the Government] access" and so there was no need for a "forced entry." (Tr. at 48.) On the whole, the Court concludes that the environment was not police-dominated and therefore this factor does not weigh in favor of finding custody.

18

### f.     Whether Detloff was Placed Under Arrest

The sixth *Griffin* factor is whether the suspect was placed under arrest at the conclusion of the interview. 922 F.2d at 1349. "Lack of arrest is a very important factor weighing against custody." *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (internal quotation marks omitted). Here, it is undisputed that Detloff was not placed under arrest at the conclusion of the interview, or even at the conclusion of the premises search. (Tr. at 31.) As a result, this factor weighs against a finding of custody.

In sum, because none of the aggravating factors weigh in favor of a custody finding and because the mitigating factors are either neutral or weigh against a finding of custody, the Court concludes that Detloff was not in custody at the time of the interview. Accordingly, he was not entitled to *Miranda* warnings before speaking with Agent Holden, and his motion to suppress statements should be denied.

### C.   Consent to Search the Storage Area

For reasons similar to those advanced in connection with his motion to suppress the statements he made during his interview, Detloff argues that his written consent to the search of the storage room was not free and voluntary because the police presence overbore his will and the environment was inherently coercive. (Detloff's Suppl. Br. at 14–15.)

### 1.     Legal Standard

"Under the fourth and fourteenth amendments, searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions." *United States v. Cedano–Medina*, 366 F.3d 682, 684 (8th Cir. 2004). "A warrantless search is valid if conducted pursuant to the knowing and voluntary

19

consent of the person subject to a search." *United States v. Brown*, 763 F.2d 984, 987 (8th Cir. 1985).  Whether "consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).  "The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion." *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005).

The Eighth Circuit considers a number of factors including "1) age, 2) general intelligence and education, 3) whether the individual was under the influence of drugs or alcohol, 4) whether he was informed of his Miranda rights, and 5) whether he had experienced prior arrests and was thus aware of the protections the legal system affords suspected criminals." *Id.* (footnote omitted).

> Additionally, the environment in which the alleged consent was secured is also relevant. Accordingly, we consider 1) the length of time one was detained, 2) whether the police threatened, physically intimidated, or punished the suspect, 3) whether the police made promises or misrepresentations, 4) whether the suspect was in custody or under arrest when the consent was given, 5) whether the consent occurred in a public or a secluded place, and 6) whether the suspect stood by silently as the search occurred.

*Id.*

### 2.    Analysis

Detloff was provided with, and signed, a consent to search form provided by the Government and witnessed by Agents Holden and Vogel.  (Gov't Ex. 5; *see also* Tr. at 71.)  He received instructions about the form before he signed it.  (Tr. at 71, 72.)  The consent form identified the area to be searched as "[t]he storage room for suite 200 located in the basement" of DMAM's office building, and specifically states that "I have been advised of my right to refuse consent"; "I give this permission voluntarily"; and "I authorize these

agents to take any items which they determine may be related to their investigation." (Gov't Ex. 5.)

There is nothing on the face of the form that would suggest Detloff was tricked or duped into providing inculpatory evidence. Thus, he does not allege the form was somehow deficient, but instead argues there was undue duress in the manner in which the agents secured his signature. (Detloff's Suppl. Br. at 14–15.)

But none of the relevant factors suggest that Detloff's consent was coerced. There is nothing in the record to suggest that he was under the influence of drugs or alcohol. There is nothing in the record to suggest that his age or intelligence made him particularly vulnerable to coercion. Furthermore, in light of the above analysis of the *Griffin* factors, the Court finds nothing coercive in the setting in which the consent was secured. For example, he was interviewed in DMAM's offices and gave his consent there, the interview was "casual, businesslike," the agents never brandished their weapons, and Detloff was never physically threatened or restrained. *See, e.g.*, (Tr. at 27–31.) The consent form that he signed stated expressly that he "had been advised of [his] right to refuse consent." (Gov't Ex. 5.) Furthermore, regardless of whether the Court considers the two-hour interview or the five-hour search (or even a total potential time of five to seven hours in which the Government was present at DMAM's offices), the Eighth Circuit has not found these durations to be problematic per se. *See, e.g.*, *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001) ("We do not find the period of interrogation in the present case— approximately two hours—to be particularly lengthy."); *Jenner v. Smith*, 982 F.2d 329, 334

21

(8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive.").

In sum, there is nothing to suggest that Detloff's consent was obtained unknowingly, involuntarily, or was otherwise the product of coercion. Consequently, the consent form signed by Detloff is sufficient to show he consented to the search and the Court recommends that his motion to suppress evidence obtained on the basis of his consent be denied.

### D.   Four-Corners Challenges to the Search Warrants

As alternative grounds for suppression, Defendants generally challenge the search warrants for the Detloff residence, DMAM's offices, and Detloff's Google email account and ask for a "four-corners review" of the search warrant affidavits. Defendants assert that they lack probable cause, although they do not identify any specific deficiencies in any of the affidavits. *See, e.g.*, (Detloff's Suppl. Br. at 14, 15; Def.'s Mot. to Suppress Evidence Obtained as a Result of Search & Seizure [Doc. No. 54 at 11–13].)

### 1.   Legal Standard

Search warrants are presumptively valid. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). Therefore, a court reviewing a previous determination of probable cause must give "great deference" to the issuing judge's assessment. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted). If the issuing judge "relied solely on the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Etheridge*,

22

165 F.3d 655, 656 (8th Cir. 1999) (internal quotation marks omitted).  The affidavit must establish a "nexus . . . between the item to be seized and criminal behavior."  *Warden v. Hayden*, 387 U.S. 294, 307 (1967).  There must also be a nexus between the contraband and the place to be searched.  *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000).  "Probable cause to issue a search warrant exists if, in light of the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shockley*, 816 F.3d 1058, 1061 (8th Cir. 2016) (internal quotation marks omitted).  Ultimately, the probable cause standard "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act."  *Kaley v. United States*, 571 U.S. 320, 338 (2014) (alteration in original) (internal quotation marks omitted).

### 2.    Analysis

The Court is satisfied that each search warrant is supported by probable cause.  All of the affidavits contain information that establishes a nexus among the criminal behavior under investigation, the evidence to be seized, and the place to be searched.  None of the supporting affidavits are "glaringly deficient" such as "mak[ing] no attempt to identify with any specificity the source of information, the basis of knowledge, age of knowledge, or any other information that would bear on" the veracity of the affiant's information that reviewing courts consider in the context of probable cause determinations.  *United States v. Nelson*, No. 04-cr-4651 (DWF/JSM), 2005 WL 1355025 at *1, 2 n.1 (D. Minn. June 2, 2005) (Frank, J.).  Accordingly, in view of the deference due to the search warrants and because the parties have not identified, and the Court has not found, any glaring deficiencies

in the affidavits, the Court concludes that the search warrants are supported by probable

cause.

### a.    Detloff Residence

Agent Holden provided the affidavit in support of the application for the search

warrant for the Detloff residence.  (Gov't Ex. 6.)  He averred numerous facts and

circumstances in his affidavit, the most salient of which are:

- A cooperating witness identified over $85,000 in payments made to Detloff, allegedly in violation of 15 U.S.C. § 1, and 18 U.S.C. §§ 1341, 1343, 1344.

- The cooperating witness stated that s/he would, at the direction of Detloff, "obtain multiple complementary, non-competitive bids for Detloff" to submit to financial institutions "to create the appearance of competition where there was none." Because there was actually no competition, Detloff was able to steer work to the cooperating witness.

- The cooperating witness turned over hundreds of business documents and "made several consensually recorded phone calls" to Detloff in which Detloff allegedly made inculpatory statements.

- The cooperating witness stated that if s/he had not paid Detloff referral or finder fees, s/he would not have received work from Detloff; therefore, the cooperating witness felt forced to make these payments.

- In 2014, Government-sponsored financial institutions, like Fannie Mae, began awarding contracts by rotation, which "effectively end[ed] Detloff's ability to refer work to" the cooperating witness.  The cooperating witness stopped making payments as soon as Detloff could no longer steer work to the cooperating witness.

- Throughout the period in which this was ongoing, the cooperating witness stated s/he and Detloff took steps to conceal payments made by the cooperating witness to Detloff from financial institutions.

- Based on Agent Holden's experience with similar investigations, Agent Holden surmised the concealments were done because financial institutions would not approve contracts awarded to the cooperating witness if they were aware of the payments made to Detloff.

- Aspects of the statements and documents provided by the cooperating witness were corroborated through interviews with other witnesses.

- In May 2015, Agent Holden conducted a trash pull at the residence and identified both software mailers for accounting software and other business documents; based on his personal training and experience, Agent Holden stated that this "indicate[s] that at least one resident of the Subject Residence is currently engaged in real estate and property management as well as the accounting for that (or another) business."

- The information obtained through the trash pull at the residence was corroborated with witness testimony and pretextual phone calls to the business.

- Based on Agent Holden's training and experience, individuals involved in fraudulent schemes "often maintain within their residence items evidencing their possession of assets and personal financial transactions."

The Court concludes that the information conveyed in Agent Holden's affidavit establishes probable cause to believe that evidence of a crime would be found at the Detloff residence. Consequently, evidence seized pursuant to the warrant should not be suppressed.

### b.    DMAM's Offices

Agent Holden also provided the affidavit in support of the search warrant for DMAM's offices in Hopkins, Minnesota. (Gov't Ex. 7.) The affidavits for the Detloff residence and DMAM's offices appear to be identical. In addition to the facts pertinent to probable cause that evidence would be found at the residence, the affidavit contained facts related to the business address:

- The cooperating witnesses stated that for most of the time in which it was engaged in the allegedly illegal activity, DMAM had offices in Eden Prairie, Minnesota, but that a few years prior to the affidavit, DMAM's offices moved to the Hopkins location.

- The cooperating witness stated s/he would receive invoices from DMAM for ten percent of the value of the repair work done on a contract obtained using the non-competitive bidding scheme.

- The invoices included the instruction that checks should be made payable to DMAM, attention Lori Detloff.

- These invoices were labeled as "management fees," although the cooperating witness stated "management fees" were synonymous with the referral fees.

- Pursuant to the invoices, the cooperating witness submitted at least twenty-nine checks made out to DMAM, attention Lori Detloff.

- In May 2015, Agent Holden made a pretextual phone call to a phone number associated with the Hopkins address and was played a recorded message stating that the caller had reached DMAM and that it could press a specified number to reach Lori Detloff in accounting.

- At the end of May, Agent Holden walked through the public hallways outside of DMAM's offices "and observed through a window of the Subject Office several manila folders containing what appeared to be business records on a desk in the Subject Office."

- Based on his training and experience, Agent Holden believed that Detloff was conducting the allegedly illegal dealings out of DMAM's offices.

The Court concludes that the information conveyed in Agent Holden's affidavit establishes probable cause to believe that evidence of a crime would be found at DMAM's offices. Consequently, evidence seized pursuant to the warrant should not be suppressed.

### c.    Detloff's Google Email Account

Finally, as it relates to the search warrant for Detloff's Google email account (the "Target Email Account"), Agent Vogel provided the affidavit in support. (Gov't Ex. 8.) Many of the factual allegations in Agent Vogel's affidavit are the same or similar to those in Agent Holden's affidavit, specifically those pertaining to the alleged scheme. Additional salient facts included:

- On the basis of the interview conducted on June 10, 2015, and based on experience working on similar schemes, Agent Vogel stated that Detloff used email to conduct both legitimate business and the allegedly illegitimate business.

- In the industry in which Detloff works, it is commonplace to receive email "notification[s] from mortgage lenders about the properties in need of repair and to solicit bids from repair contractors."

- On the basis of the investigation surrounding Detloff's allegedly fraudulent activities, "email accounts used for fraudulent purposes were the same ones used for legitimate business."

- The cooperating witness stated that s/he communicated with Detloff using email.

- Additional cooperating witnesses also indicated that Detloff used email communications to communicate with them, and that while Detloff used many email addresses, "Detloff often forwarded . . . correspondence[s] from his other email accounts to the Target Email Account."

- Pursuant to the search of DMAM's offices conducted on June 10, 2015, evidence was seized that tended to show that Detloff used the Target Email Account to communicate with DMAM's accountants. For example, Agent Vogel described various emails from the Target Email Account implicating the alleged scheme that were stapled to numerous business documents.

The Court concludes that the information conveyed in Agent Holden's affidavit establishes probable cause to believe that evidence of a crime would be contained within emails associated with the Target Email Account. Consequently, evidence seized pursuant to the warrant should not be suppressed.

## III.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Jeffrey J. Detloff's Motion to Suppress Search and Seizure Evidence [Doc. No. 42] **be DENIED**;

2. Detloff's Motion to Suppress Statements [Doc. No. 43] **be DENIED**; and

3.  Defendant Detloff Marketing and Asset Management's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 54] **be DENIED**.

Dated: April 18, 2019

_s/ Hildy Bowbeer_
HILDY BOWBEER
United States Magistrate Judge

## Notice

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.